**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|                          |   | PRISONER |
|--------------------------|---|----------|
| JAMES McKINNON           | : | CIVIL NO. 3:03CV158 (JCH)(HBF) |
| v.                       | : |          |
| LINDA MESSENGER, ET AL.  | : | MARCH 18, 2004 |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION**

This is a civil rights action in which the plaintiff, an inmate currently incarcerated at the MacDougall-Walker Correctional Institution, is apparently seeking damages for what he alleges to be interference with his receipt of medical care when he was incarcerated at the Garner Correctional Institution ("Garner C.I.").  Specifically, the plaintiff alleges that defendants Messenger and Prescott (now Carlone) wrongfully questioned him as to why he was asking to see the Infectious Disease ("I.D.") Specialist at Garner C.I. on December 18, 2002 and wrongfully stopped his appointment with the I.D. Specialist at that time.  Based on a review of the grievances attached to the Complaint, the plaintiff also appears to be alleging that defendant Linda Messenger, L.P.N., wrongfully failed to reorder Tylenol, soap and Vaseline at some point in December, 2002.

In his Amended Complaint dated January 29, 2004, the plaintiff claims a violation Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, in that he had to have his blood drawn in the multipurpose room of H Block on some unspecified occasion because there were no available escorts to take the inmates to the medical unit at Garner C.I.

The defendants in this case are Linda Messenger, L.P.N., Iris Prescott (now Iris Carlone), R.N., and Helen Dorsey.  It would appear from the plaintiff's reference to "individual capacity" that the defendants are being sued in their individual capacity only.  These defendants were all employed by the Correctional Managed Health Care Program of the University of Connecticut Health Center during the time relevant to the Complaint which is believed to be the period from December 1, 2002 to on or about February 1, 2003.  While the Complaint and Amended Complaint are less than clear in terms of the nature of the plaintiff's claims, the defendants have done their best to interpret the complaint and decipher the claims.

The facts which are pertinent to this lawsuit are as set forth in the affidavits, exhibits and Local Rule 56(a)1 Statement filed simultaneously herewith.  These documents explain in some detail the procedures for scheduling appointments for I.D. Clinics in Department of Correction ("DOC") facilities, the plaintiff's failure to cooperate with those procedures, the course of treatment provided to the plaintiff, the appropriateness of that treatment, the absence of any involvement on the part of the defendants in housing assignments and blood drawing and the appropriateness of the actions of the defendants as they relate to the plaintiff's allegations.

## II.    <u>SUMMARY JUDGMENT</u>

Summary Judgment, "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. §56(c).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). <u>See also</u>, <u>Quarles v. General Motors Corp.</u>, 758 F.2d 839, 840 (2d Cir. 1985) (per curiam).  A party may not rely "on mere speculation or conjecture as to the true nature of the facts to

2

overcome a motion for summary judgment." <u>Knight v. U.S. Fire Ins. Co.</u>, 804 F.2d 9, 12 (2d Cir. 1986). The party opposing a motion for summary judgment "may not rest upon the mere allegation or denials of his pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. §56(e).

In discussing the history and propriety of summary judgment motions, the Supreme Court noted:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed. Rule Civ. Proc. 1 ... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

To successfully oppose a motion for summary judgment, the plaintiff must present "significant probative evidence to create a genuine issue of material fact." <u>Soto v. Meachum</u>, Civ. No. B-90-270(WWE), 1991 WL 218481, at *6 (D. Conn. Aug. 28, 1991). "[T]he mere verification by affidavit of one's own conclusory allegations is not sufficient to oppose a motion for summary judgment." <u>Greene v Georgia Pardons & Parole Bd.</u>, 807 F. Supp. 748, 751 n.5 (N.D. Ga. 1992) (citing <u>Fullman v. Graddick</u>, 739 F.2d 553, 557 (11th Cir. 1984)). An Affidavit in which the plaintiff merely restates the conclusory allegations of the complaint and denies the truth of the affidavits filed by the defendants is insufficient to create an issue of fact that would make summary judgment inappropriate. <u>Donnelly v. Guion</u>, 467 F.2d 290, 293 (2d Cir. 1972). As one court has stated, to permit such an affidavit to form the basis of denying the defendants' motion for summary judgment "would amount to permitting the plaintiff to keep [his] case in court merely by swearing that [he] has a case." <u>Zenith Vinyl Fabrics Corp. v. Ford Motor Co.</u>,

357 F. Supp. 133, 139 (E.D. Mich. 1973).  The record in this case, even when considered in a light most favorable to the plaintiff, fully supports the granting of summary judgment in favor of the defendants.

## III.    ARGUMENT

    A.    **To The Extent That This Action May Be Deemed To Include A Claim For Money Damages Under 42 U.S.C. § 1983 Against The Defendants In Their Official Capacity, Such Claims Are Barred By The Eleventh Amendment To The United States Constitution.**

"[A]bsent waiver by the State or valid congressional override, the Eleventh Amendment bars a damage action against a State in federal court."  Kentucky v. Graham, 473 U.S. 159, 169, 105 S. Ct. 3099, 3107 (1985).  In Will v. Michigan Dept. of State Police, 491 U.S. 58. 109 S. Ct. 2304, 2309, (1989), the Supreme Court summarized the scope of Eleventh Amendment immunity as follows:

> Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties.  The Eleventh Amendment bars such suits unless the State has waived its immunity, or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity.  That Congress, in passing § 1983, had no intention to disturb the State's Eleventh Amendment immunity and so alter the Federal-State balance in that respect was made clear in our decision in Quern.

(Citation omitted).  Eleventh Amendment immunity is extended to suits against state officials in their official capacity since they represent only another way of pleading an action against the state.  Hafer v. Melo, 502 U.S. 21, 112 S. Ct. 358, 361 (1991); Kentucky v. Graham, supra, 105 S. Ct. at 3105.

In the present case, it does not appear that the defendants have been sued in their official capacity.  However, if this case is deemed at some point to be a suit against the defendants in

their official capacity, then any claims against the defendants in their official capacity under 42

U.S.C. § 1983 would be barred by the Eleventh Amendment to the United States Constitution.

**B.** **The Defendants Were Not Deliberately Indifferent To The Plaintiff's Medical Needs.**

To establish an unconstitutional denial of medical care, an inmate must prove "deliberate

indifference to [his] serious medical needs." Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 291

(1976). Mere negligence will not support a Section 1983 claim. The conduct complained of

must "shock the conscience" or constitute a "barbarous act." McCloud v. Delaney, 677 F. Supp.

203, 232 (S.D.N.Y. 1988 ) (citing United States ex rel. Hyde v. McGinnis, 429 F.2d 864 (2d Cir.

1970). A treating physician will be liable under the Eighth Amendment only if his conduct is

"repugnant to the conscience of mankind." Tomarkin v. Ward, 534 F. Supp. 1224, 1230

(S.D.N.Y. 1982) (quoting Estelle, 429 U.S. at 105-06).

Inmates do not have a constitutional right to the treatment of their choice. See Dean v.

Coughlin, 804 F.2d 207, 215 (2d Cir. 1986). Thus, mere disagreement with prison officials

about what constitutes appropriate medical care does not state a claim cognizable under the

Eighth Amendment. Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998).

There are both subjective and objective components to the deliberate indifference

standard. Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). The alleged deprivation must

be "sufficiently serious" in objective terms. Wilson v. Seiter, 501 U.S. 294, 298 (1991). The

term "serious medical need" contemplates "a condition of urgency, one that may produce death,

degeneration, or extreme pain." Hathaway, supra, 37 F.3d at 66 (quoting Nance v. Kelley, 912

F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting)). See, e.g., Hathaway v. Coughlin, 841 F.2d

48 (2d Cir. 1998) (broken pins in hip); Williams v. Vincent, 508 F.2d 541, 544 (2d Cir. 1974)

(discarding inmate's ear rather than reattaching it); Martinez v. Mancusi, 443 F.2d 921, 923 (2d

Cir. 1970) (refusal to follow surgeon's instructions), cert. denied, 401 U.S. 983 (1971). Not all medical conditions, however, are considered "serious." See, e.g., Jones v. Lewis, 874 F.2d 1125 (6th Cir. 1989) (mild concussion and broken jaw); Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988) (kidney stones); Malsh v. Austin, 901 F. Supp. 757 (S.D.N.Y. 1995) (delay in providing routine dental treatment); May v. Baldwin, 895 F. Supp. 1398 (D.Or. 1995) (dry skin); Glasper v. Wilson, 559 F. Supp. 12 (W.D.N.Y. 1982) (bowel problems).

In addition to demonstrating a serious medical need to satisfy the objective component of the deliberate indifference standard, an inmate also must present evidence that, subjectively, the charged prison official acted with "a sufficiently culpable state of mind." Chance, supra, 143 F.3d at 702. "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Id. (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

**1.    Claim That Linda Messenger And Iris Carlone Asked The Plaintiff Why He Wanted To See The I.D. Specialist In Between His Regularly Scheduled Appointments.**

The primary claim in this lawsuit is the plaintiff's allegation that it was deliberate indifference for Linda Messenger, through Iris Carlone, to have asked the plaintiff why he wanted to see Dr. O'Halloran on December 18, 2002.

On December 18, 2002, the plaintiff asked Nurse Iris Carlone if he could see Dr. James O'Halloran, the I.D. Specialist assigned to Garner C.I. Nurse Carlone informed Nurse Messenger of the plaintiff's request. (Rule 56(a)1 Statement, para. 19). At the time of this request, Nurse Messenger was the HIV contact nurse at Garner C.I. As the HIV contact nurse, it was her responsibility to schedule appointments for the I.D. Clinics, assist at the clinics, schedule tests and consultations ordered by the I.D. Specialist, schedule emergency appointments with the

I.D. Specialist and generally address medical issues and needs as they pertain to the HIV infected inmate population. (Rule 56(a)1 Statement, para. 14).

The plaintiff had been seen by Dr. O'Halloran in the I.D. Clinic at Garner C.I. on November 20, 2002. He was not scheduled to be seen again in the I.D. Clinic until after the completion of blood work which was ordered to be done at the end of January, 2003. (Rule 56(a)1 Statement, para. 25). In the interim between regularly scheduled appointments at the I.D. Clinic, the day-to-day medical needs of infectious disease patients can typically be handled by the regular nursing and physician staff at the correctional facility. (Rule 56(a)1 Statement, para. 22). If an inmate asks to be seen in the I.D. Clinic prior to his next scheduled appointment, any such request must be triaged by the HIV contact nurse whose responsibility includes determining whether an inmate should be scheduled to be seen in the I.D. Clinic on an emergency basis. (Rule 56(a)1 Statement, para. 23). This protocol for scheduling appointments with the I.D. Clinic and the need to cooperate with facility medical staff in the interim between appointments with the I.D. Specialist had been explained to the plaintiff on many occasions by Dr. O'Halloran, Nurse Messenger and other medical staff. (Rule 56(a)1 Statement, para. 24).

When Nurse Carlone informed Nurse Messenger on December 18, 2002, that the plaintiff wanted to see Dr. O'Halloran, Nurse Messenger asked Nurse Carlone to meet with the plaintiff to determine the reason for his request. Nurse Carlone met privately with the plaintiff and asked him why he wanted to see Dr. O'Halloran. The plaintiff refused to give any reason and did not mention any particular medical problem or medical issue. Nurse Carlone then informed Nurse Messenger of the plaintiff's refusal. (Rule 56(a)1 Statement, paras. 26-27). Thereafter, Nurse Carlone had no further contact with the plaintiff or Nurse Messenger concerning the plaintiff's request to see Dr. O'Halloran. (Rule 56(a)1 Statement, para. 28).

Because the plaintiff refused to disclose any reason for wanting to see Dr. O'Halloran on an emergency basis and there being no observable evidence supporting such a request, his refusal to cooperate was documented and his request was denied. (Rule 56(a)1 Statement, para. 29). In the opinions of Dr. O'Halloran and Dr. Blanchette, it was not only appropriate for Nurse Messenger through Nurse Carlone to have tried to ascertain why the plaintiff was requesting an emergency referral to the I.D. Clinic, it was her responsibility to do so. There being no apparent reason for the request, it was appropriately denied. (Rule 56(a)1 Statement, para. 30).

When an emergency appointment with Dr. O'Halloran was arranged on January 8, 2003, the concerns raised by the plaintiff related to a request for a bar of Basis soap and some Vaseline for reported dry skin. He also asked Dr. O'Halloran to look at his toenails as he was being treated for a fungus condition. Finally, he asked that some liver function blood tests that had been earlier ordered to be done around the end of January be moved up. (Rule 56(a)1 Statement, para. 31). As discussed in the affidavits filed herewith, none of the issues raised by the plaintiff with Dr. O'Halloran on January 8, 2003 were of a serious nature and each could have been addressed easily by the facility medical staff. (Rule 56(a)1 Statement, paras. 32-34).

There is no indication that the plaintiff's request to see Dr. O'Halloran on December 18, 2002 involved any "serious medical need." Indeed, the plaintiff did not mention any need to Nurse Carlone or Nurse Messenger much less a serious medical need. There is no evidence that having waited until January 8, 2003 to see Dr. O'Halloran caused the plaintiff any injury whatsoever. If we were to assume that there was some slight injury involved, the plaintiff brought it upon himself by refusing to discuss any problems or issues with Nurse Carlone and Nurse Messenger. The actions of defendants Carlone and Messenger were entirely appropriate and did not in any fashion constitute deliberate indifference to a serious medical need.

**2.    Claim That Nurse Linda Messenger Refused To Order Tylenol, Soap And Vaseline For The Plaintiff.**

With respect to the plaintiff's allegations regarding a failure to order Basis soap and Vaseline, the plaintiff did complain to Dr. O'Halloran of dry skin from time to time. Dr. O'Halloran would order Basis soap and Vaseline for him in an effort to keep his attention focused on the more serious issues concerning his HIV disease and his need to take his medications which he would periodically refuse to take. The plaintiff was given a bar of Basis soap in November, 2002. When he demanded a whole jar of Vaseline on November 8, 2002, he was given a smaller amount. He refused a tube of Vaseline on December 10, 2002 and was given a small tube of Vaseline on December 19, 2002. As indicated <u>supra</u>, he refused to discuss any medical issues with Nurse Messenger and Nurse Carlone and he did not ask to see the facility physician regarding any problem with soap or Vaseline. When he met with Dr. O'Halloran on January 8, 2003, he did not indicate that Nurse Messenger had denied him any soap or Vaseline nor did he present with any medical condition that could be attributed to the absence of Basis soap or Vaseline. (Rule 56(a)1 Statement, paras. 33-34).

With respect to the plaintiff's allegations regarding a failure to reorder Tylenol, Dr. O'Halloran's earlier order for Tylenol as needed (prn) for complaints of pain expired on November 29, 2002. The plaintiff was refusing to discuss any medical issues with Nurse Messenger and the chart entries reflect no discussion with any medical staff during the period from November 29, 2002 to January 22, 2003 regarding headaches or a renewal of Tylenol. The order for Tylenol could easily have been renewed by the facility physician if the plaintiff had asked to see the facility physician. (Rule 56(a)1 Statement, paras. 35-37).

When the plaintiff saw Dr. O'Halloran on January 8, 2003, he did not mention any headaches or request any Tylenol.  It was not until his visit with Dr. O'Halloran on January 22, 2003 that he requested some Tylenol.  (Rule 56(a)1 Statement, paras. 38-39).

There is no evidence that the plaintiff's allegations regarding Basis soap, Vaseline and Tylenol involve "serious medical needs."  Dr. O'Halloran saw no evidence of any serious skin condition.  He gave the plaintiff some Basis soap and Vaseline because the plaintiff asked for it and there were more important issues that he wanted to address with the plaintiff.  As for the Tylenol, the plaintiff's failure to mention any pain or ask for any Tylenol when he saw Dr. O'Halloran on January 8, 2003 is strong evidence that the reordering of Tylenol was not a serious medical need.  Even if one were to assume that there was a serious medical need, there would be no basis for a finding of deliberate indifference when the plaintiff was refusing to discuss medical issues with Nurse Messenger and refusing to ask to see the facility physician.

### 3.     Claim That Nurse Linda Messenger Did Not Give The Plaintiff His Multivitamin Pill On December 7, 2002.

On December 7, 2002, the plaintiff did not show up at the medication window for the daily multivitamin pill that he is given at 8:00 a.m.  When he showed up at the medication window at 1:30 p.m. on December 7, 2002 demanding his multivitamin pill, he was told by Nurse Messenger that he was supposed to have come at 8:00 a.m. for his daily multivitamin pill and that she did not have the multivitamin packet with her at that time.  Inmates cannot show up whenever they feel like it and demand to be given earlier doses of medication.  Typically, if an inmate misses a dose of medication by more than two and a half hours,  he would have to wait until his next scheduled dose.  This is particularly true in the case of a multivitamin pill where one missed pill did not put the plaintiff in any jeopardy.  (Rule 56(a)1 Statement, para. 18).

10

It was the plaintiff's own actions that caused him to miss his daily vitamin pill on December 7, 2002. There is no evidence that a single missed vitamin pill created any medical problem for the plaintiff. This claim does not involve either a serious medical need or any evidence of deliberate indifference.

4.      **Claim Against Helen Dorsey For Approving The Denial Of Plaintiff's Medical Grievances.**

As nearly as can be determined by the defendants, Ms. Helen Dorsey is a defendant in this action because she allegedly failed to stop Linda Messenger from interfering with the plaintiff's appointments with Dr. O'Halloran.

As the Health Services Administrator, one of Ms. Dorsey's job responsibilities was to serve as the Level 2 reviewer of medical grievances. As stated in her affidavit and as set forth in paragraphs 45 through 48 of defendants' Rule 56(a)1 Statement, Ms. Dorsey responded to the grievances attached to the plaintiff's Complaint by restating to him the protocol that must be followed when requesting an emergency appointment with the I.D. Clinic and the fact that day-to-day medical issues that come up between I.D. Clinic appointments are to be addressed by the facility medical staff. She also pointed out to him that he must formally request a renewal of medications from a nurse or physician and the fact that he had not mentioned any headache or requested any Tylenol when he saw Dr. O'Halloran on January 8, 2003.

Ms. Dorsey's comments to the plaintiff were accurate and based on her review of the records. Her actions with respect to the plaintiff's grievances were appropriate and fully supported by the opinions expressed in the affidavits of Dr. O'Halloran and Dr. Blanchette. There is no evidence that Ms. Dorsey prevented or interfered with any of the plaintiff's scheduled appointments with Dr. O'Halloran.

5.     **Summary Regarding Plaintiff's Claims Of Deliberate Indifference Against The Defendants.**

The plaintiff was seen in the I.D. Clinic at Garner C.I. at intervals deemed appropriate and adequate by Dr. O'Halloran and Dr. Blanchette.   (Rule 56(a)1 Statement, para. 20). Dr. O'Halloran, who is primarily engaged in private medical practice, has stated unequivocally that the care provided to the plaintiff at Garner C.I. was comparable to the level of care which private patients receive in the community.  (Rule 56(a)1 Statement, para. 41).  In the opinions of Dr. O'Halloran and Dr. Blanchette, the plaintiff received excellent care at Garner C.I. showing fairly steady improvement in key lab reports.  (Rule 56(a)1 Statement, para. 41).  Dr. O'Halloran has found Linda Messenger to be a very capable and conscientious person who has been of great assistance to him in ensuring the smooth functioning of the I.D. Clinics.  In his opinion, the actions of Nurse Carlone and Nurse Messenger were very appropriate while the plaintiff's demands to be seen only by Dr. O'Halloran were unreasonable and unwarranted.  (O'Halloran Aff., para. 19).  Clearly, none of the three defendants were in any way deliberately indifferent to any serious medical need of the plaintiff.

C.     **Plaintiff's Claims Under The ADA Should Be Dismissed.**

Title II of the ADA provides, in relevant part:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subject to discrimination by any public entity.

42 U.S.C.  12132.

The term "disability" is defined as:

(A)     a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B)     a record of such an impairment; or,

(C)     being regarded as having such an impairment.

42 U.S.C.  12102(2).

The term "qualified individual with a disability" is defined as:

an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provisions of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2).

In regulations promulgated to implement the ADA, the phrase "physical or mental impairment" is defined to include any physiological disorder or condition that affects the "neurological" or "musculoskeletal" systems as well as "HIV disease (whether symptomatic or asymptomatic)." 28 C.F.R. § 35.104. The ADA regulations also define the phrase "major life activities" as meaning "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." Id.

On January 29, 2004, the plaintiff amended his Complaint "to add ADA claim." In the Amended Complaint, the plaintiff made clear that he was suing the three defendants in their "individual capacity." He reworded to some extent his earlier Eighth Amendment allegations against the defendants. He also added an ADA claim in which he alleged that he was housed in H Block at Garner C.I. and that the inmates in H Block need an escort to the medical unit. When escorts are not available, inmates in H Block have their blood work done in a "game" room with other inmates sometimes next to you looking at paperwork which may reflect an inmate's HIV status.

## 1.    Plaintiff Failed To Exhaust Administrative Remedies.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, provides in relevant part: "No action shall be brought with respect to prison conditions under section 1983 of this

title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." See Porter v. Nussle, 534 U.S. 516, 122 S. Ct. 983, 992 (2002).

In Administrative Directive 9.6, the Connecticut DOC has set forth a comprehensive Inmate Grievance Procedure. See Administrative Directive 9.6 attached hereto as Attachment A. While Section 6 B of A.D. 9.6 indicates that issues concerning diagnosis and treatment are not grievable, the plaintiff's ADA claim in this case does not concern such issues. Rather, the plaintiff is complaining about his blood being drawn in the multipurpose room in H Block at Garner C.I. due to the unavailability of escorts to take inmates to the medical unit. Clearly, the plaintiff's claim relates to a "prison condition" and not a diagnostic or treatment decision.

The exhaustion requirement under the PLRA applies to claims under the ADA. See, e.g., Burgess v. Garvin, et al., 2003 U.S. Dist. LEXIS 14419 at *8 (S.D.N.Y. August 18, 2003) (attached), and Dickinson v. Connecticut Dept. of Correction, et al., No. 3:00CV1339 (AHN), slip. op. at 12 (D. Conn. July 24, 2001) (attached).

Joan Dobson, R.N., is the medical grievance coordinator at the Garner C.I. As such, she maintains copies of inmate medical grievances filed at Garner C.I. A thorough search of the medical grievance files at Garner C.I. by Ms. Dobson did not reveal any grievance filed by the plaintiff relating to the ADA generally or the drawing of blood in H Block. (Rule 56(a)1 Statement, paras. 56-58). In addition, the plaintiff has not alleged that he filed any grievance

14

related to his ADA claim concerning his blood being drawn in the multipurpose room of H Block.

Under Section 10 G of A.D. 9.6, a grievance must be filed within thirty days of the occurrence or discovery of the cause of the grievance. While the plaintiff does not give any particular date as to when his blood was drawn in H Block, it had to occur prior to February 25, 2003 in that he has not resided at Garner C.I. since that date. (Rule 56(a)1 Statement, para. 17; Exhibit A to Messenger Aff.). Any attempt to file a grievance at this time regarding the drawing of his blood in H Block at Garner C.I. would be untimely.

Having failed to exhaust available administrative remedies, the plaintiff's claim under the ADA should be dismissed.

> **2.    Title II Of The ADA Does Not Authorize Suits Against State Officials In Their Individual Capacity.**

The ADA claim in this case is being brought against the three defendants in their individual capacity as stated clearly in the Amended Complaint. It is well established that neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials. Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001). Therefore, the ADA claims against the three defendants in this action should be dismissed.

> **3.    The Defendants Had No Personal Involvement In The Plaintiff's Placement In H Block Or In Drawing Blood.**

Even if the plaintiff were allowed to bring an action for money damages against individual state employees for an alleged violation of a federal statute (ADA), it is well settled that in a civil rights action for money damages against a defendant in his individual capacity for an alleged violation of federal constitutional or statutory rights, a plaintiff must demonstrate the defendant's direct or personal involvement in the actions which are alleged to have caused the

deprivation. <u>Gill v. Mooney</u>, 824 F.2d 192, 196 (2d Cir. 1987); <u>McKinnon v. Patterson</u>, 568 F.2d 930, 934 (2d Cir. 1977).

Neither Linda Messenger, Iris Carlone nor Helen Dorsey have any involvement with inmate housing assignments including the plaintiff's placement in H Block. In addition, none of the three defendants are involved in drawing blood at Garner C.I. They are not aware of any safety or confidentiality issues relating to the drawing of blood at Garner C.I. To the best of their knowledge, only one inmate at a time is allowed into the room when blood is drawn while other inmates have to wait at the door. (Rule 56(a)1 Statement, paras. 42-44).

The Amended Complaint in this action contains no allegation that any of the defendants were personally involved in the decision to place the plaintiff in H Block or personally involved with the drawing of blood on H Block.

### 4.    The Plaintiff Has Not Stated A Claim Under The ADA.

Other than stating that he is HIV infected, the plaintiff has not indicated any impairment of a major life activity that would prevent him from performing any of the activities listed in the above-cited ADA regulations. Nevertheless, for purposes of this motion for summary judgment, we will assume that the plaintiff's HIV infection satisfies the "disability" requirements of the ADA.

The key issue regarding access to programs and services is whether the plaintiff has been able to participate in programs and activities with or without reasonable accommodations from the prison facilities. To state a claim under the ADA, an inmate must allege that programs and services that are available to general population inmates are not available to him due to his handicap. <u>Garrett v. Angelone</u>, 940 F. Supp. 933, 942 (W.D.Va. 1996). "[T]he central purpose of the ADA and § 504 of the Rehabilitation Act is to assure that disabled individuals receive

'evenhanded treatment' in relation to the able-bodied."  Doe v. Pfrommer, 148 F.3d 73, 83 (2d Cir. 1998).

The plaintiff in this case resided in various housing units at Garner C.I. including H Block.  While he does not state the reason for his placement in H Block, he does not suggest that it had anything to do with his HIV infection.  Nowhere does he list any programs or services that have been denied to him due to his HIV infection.  He does not indicate that he was treated differently from other inmates in H Block with respect to the drawing of blood.  The procedures for drawing blood in H Block are the same as the procedures for drawing blood in the medical unit.  The plaintiff is treated no differently than any other inmate who is having his blood drawn. (Rule 56(a)1 Statement, paras. 49-55).

There is no evidence that the plaintiff has been discriminated against because of his HIV infection.  Rather, he receives a level of care and specialist services not generally available to other inmates who are not HIV infected.  His level of care is comparable to that which private HIV patients receive in the community.  (Rule 56(a)1 Statement, para. 41).

The plaintiff has not stated any facts in his Amended Complaint to support a claim under the ADA.

**5.    A Suit For Money Damages Against The State Under Title II Of The ADA Cannot Be Maintained In This Case.**

As noted supra, it is stated in the Amended Complaint that the ADA claim is being brought against the defendants in their "individual capacity."  Even if we were to assume arguendo that the ADA claim was brought against the defendants in their official capacity, it should be dismissed.

In the first place, since none of the defendants had any involvement in the plaintiff's housing assignment or the drawing of blood, they are not the proper officials to sue individually or officially with respect to the plaintiff's ADA claim.

Secondly, the issues of whether Congress overstepped its authority under § 5 of the Fourteenth Amendment in abrogating the states' Eleventh Amendment immunity to suit under the ADA is an open question. During this term, the U.S. Supreme Court will decide whether state governments can be sued for violating Title II of the ADA in Tennessee v. Lane, 315 F.3d 680 (6th Cir. 2003) cert. granted, 123 S.Ct. 2622 (No. 02-1667).

In Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, supra, 280 F.3d at 112, the Court held that a private suit for money damages under Title II of the ADA may only be maintained against a state "if the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability…." Such discriminatory animus or ill will may be found in "conduct that is based on irrational prejudice or wholly lacking a legitimate government interest."

The plaintiff's allegations in this case are devoid of any claim that the unavailability of escorts for inmates in H Block and the need to draw blood in the multipurpose room of H Block were motivated by irrational discriminatory animus or ill will based on his alleged disability. Therefore, plaintiff's suit under the ADA could not be maintained even if he had sued proper state officials in their official capacity.

**D.**   **In The Event That The Court Finds That The Defendants May Have Violated Some Constitutional Or Statutory Right Of The Plaintiff, They Should Be Entitled To Qualified Immunity.**

The doctrine of qualified immunity shields state officials from liability for damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct.

2727, 2738 (1982). The Second Circuit has described the circumstances where qualified immunity would apply as follows:

> a government official sued in his individual capacity … is entitled to qualified immunity in any of three circumstances: (1) if the conduct attributed to him is not prohibited by federal law …; or (2) where the conduct is so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time of the conduct …; or (3) if the defendant's action was 'objective[ly] legal[ly] reasonable[ ] … in light of the legal rules that were clearly established at the time it was taken.' These three issues should be approached in sequence, for if the second is resolved favorably to the official, the third becomes moot; a favorable resolution of the first moots both the second and the third.

X-Men Security, Inc. v. Pataki, 196 F.3d 56, 65-66 (2d Cir. 1999) (citations omitted).

A right is clearly established if a reasonable person in the defendant's position should know that his or her actions violate that right. The unlawfulness must be apparent. McCullough v. Wyandanch Union Free Sch. Dist., 187 F.3d 272, 278 (2d Cir. 1999) (citation omitted). In other words, a state official should not be forced to have to defend his actions against civil rights challenges unless the state of the law at the time of the alleged conduct gave him "fair warning" that his actions were unlawful. Hope v. Pelzer, 122 U.S. 1508, 1516 (2002).

In the present case, defendants Messenger and Carlone were simply complying with established procedure and the responsibilities of their job assignment when they sought to determine why the plaintiff was requesting an emergency referral to the I.D. Clinic. When he was seen by the I.D. Specialist on January 8, 2003, it became apparent that there was no need for an emergency referral and that the plaintiff's medical issues could have been adequately handled by the facility medical staff.

The plaintiff refused to discuss medical issues with defendants Carlone and Messenger including any problem with his Basis soap, Vaseline and Tylenol. He had been given Basis soap in November, 2002 and Vaseline in December, 2002 for subjective complaints of dry skin which

was not considered a serious medical need.  When seen by Dr. O'Halloran on January 8, 2003, the order for Basis soap and Vaseline was renewed.  At that time, he did not mention any problem with headaches or request any Tylenol.  Defendant Helen Dorsey reviewed the plaintiff's grievances and restated to the plaintiff the policies regarding the scheduling of appointments for the I.D. Clinic and the reordering of medication.

The defendants are not aware of any court ruling that would suggest that their actions in this case were anything other than appropriate and within accepted standards of care.  It is respectfully submitted that a reasonable person in the position of the defendants would not consider their actions to have been a violation of the plaintiff's constitutional or statutory rights.

## IV.    <u>CONCLUSION</u>

For all of the foregoing reasons, the defendants' Motion for Summary Judgment should be granted.

DEFENDANTS
Linda Messenger, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:    __/s/_____
Richard T. Couture
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Federal Bar #ct05480
E-Mail:  richard.couture@po.state.ct.us
Tel.: (860) 808-5450
Fax: (860) 808-5591

## <u>CERTIFICATION</u>

I hereby certify that a copy of the foregoing Memorandum in Support of Motion for Summary Judgment was sent by first class mail, postage prepaid, this 18th day of March, 2004, to:

       James McKinnon, No. 100770
       MacDougall-Walker Correctional Institution
       1153 East Street South
       Suffield, CT  06080


                                 ___/s/_____
                                   Richard T. Couture
                                   Assistant Attorney General