UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| JAMES McKINNON | : | PRISONER<br>CIVIL NO. 3:03CV158 (JCH)(HBF) |
| v. | : |  |
| LINDA MESSENGER, ET AL. | : | MARCH 18, 2004 |

**DEFENDANTS' LOCAL RULE 56(a)1 STATEMENT**

The defendants respectfully represent, pursuant to Local Rule 56(a)1, that the following material facts are not in dispute:

1. James O'Halloran, D.O., is a physician licensed to practice Medicine in the State of Connecticut since 1991. (O'Halloran Aff., para. 1).

2. Dr. O'Halloran is Board Certified in Internal Medicine and Infectious Disease. (O'Halloran Aff., para. 2).

3. In addition to his private practice, Dr. O'Halloran conducts Infectious Disease Clinics ("I.D. Clinics") at the Garner Correctional Institution ("Garner C.I.") and the Cheshire Correctional Institution ("Cheshire C.I.") pursuant to a contract with the Correctional Managed Health Care Program of the University of Connecticut Health Center ("UCHC"). He has been conducting I.D. Clinics at Garner C.I. for approximately four years. (O'Halloran Aff., para. 3).

4. Edward Blanchette, M.D., is a physician licensed to practice Medicine in Connecticut since 1975. (Blanchette Aff., para. 1).

5. Dr. Blanchette is Board Certified in Internal Medicine and Infectious Disease. (Blanchette Aff., para. 2).

6. Dr. Blanchette is familiar with the consent decree in Doe v. Meachum, No. H88-562 (PCD) (JGM), having been involved in the drafting of the medical provisions of the consent

decree in 1990. The <u>Doe v. Meachum</u> consent decree deals with virtually every aspect of the provision of care and treatment to HIV infected inmates including the establishment of Infectious Disease Specialist services in and for each Department of Correction ("DOC") complex. A "complex" is a geographical grouping of correctional facilities. At the time of the signing of the consent decree in 1990, it was anticipated that there would generally be a weekly I.D. Clinic at each complex. (Blanchette Aff., para. 3).

7. Dr. Blanchette has been involved as a panel member responsible for monitoring compliance with the <u>Doe v. Meachum</u> consent decree since 1990. (Blanchette Aff., para. 4).

8. Dr. Blanchette is presently the Director of Clinical Services for the Connecticut DOC. He has also conducted I.D. Clinics at several correctional facilities during the period 1990 to the present. Currently, he conducts I.D. Clinics at the MacDougall-Walker Correctional Institution and the Bridgeport Correctional Center. (Blanchette Aff., para. 5).

9. Dr. Blanchette has read the Complaint in this matter and has reviewed James McKinnon's medical records. (Blanchette Aff., para. 6).

10. Linda Messenger is a Licensed Practical Nurse ("L.P.N.") and has been licensed to practice nursing in the State of Connecticut since 1990. (Messenger Aff., para. 1).

11. From 1990 to 1993, Nurse Messenger was employed at the Yale-New Haven Hospital working primarily with HIV infected patients. (Messenger Aff., para. 2).

12. Nurse Messenger has been employed with the Connecticut DOC since 1993. The Correctional Managed Health Care Program of UCHC has provided health services to the inmate population in Connecticut since 1997. (Messenger Aff., para. 3).

13. From January, 2002 to the present, Nurse Messenger has served as the HIV contact nurse at Garner C.I. (Messenger Aff., para. 4).

14. Each correctional facility has an HIV contact nurse whose responsibilities include scheduling appointments for the I.D. Clinics, assisting at the clinics, scheduling tests and consultations ordered by the I.D. Specialists, scheduling emergency appointments with the I.D. Specialists and generally addressing issues and needs as they pertain to the HIV infected inmate population and ensuring compliance with the <u>Doe v. Meachum</u> consent decree. (Blanchette Aff., para. 10; O'Halloran Aff., para. 9; Messenger Aff., para. 5).

15. Iris Carlone, formerly Iris Prescott, is a Registered Nurse licensed to practice nursing in the State of Connecticut since 1991. (Carlone Aff., para. 1).

16. Nurse Carlone was a Correctional Head Nurse at Garner C.I. from July, 1993 to August, 2003 at which time she transferred to the York Correctional Institution. (Carlone Aff., para. 2).

17. Mr. James McKinnon, the plaintiff in this action, was incarcerated at Garner C.I. during the period July, 2001 through February 25, 2003 at which time he transferred to Cheshire C.I. (Messenger Aff., para. 6; Ex. A to Messenger Aff.).

18. On December 7, 2002, Nurse Messenger was giving out medications at the medication window at approximately 1:20 p.m. At that time, Mr. McKinnon came up to the medication window and demanded to know where his multivitamin pill was. Nurse Messenger informed Mr. McKinnon that he was supposed to come for his daily multivitamin pill at 8:00 a.m. and that she did not have the multivitamin packet with her. When inmates do not show up for their 8:00 a.m. medications they will usually be kept at the window until 10:30 a.m. If the inmate does not show up by 10:30 a.m., he will usually have to wait until his next scheduled dose. It is important that the inmates take their medications at the times prescribed and not just

show up whenever they get around to it. In the case of a multivitamin pill, missing one pill did not place Mr. McKinnon in any jeopardy. (Messenger Aff., para. 7, Ex. B to Messenger Aff.).

19. On December 18, 2002, Mr. McKinnon told Nurse Iris Carlone that he wanted to see Dr. O'Halloran, the I.D. Specialist assigned to Garner C.I. At that time, Dr. O'Halloran was conducting an I.D. Clinic at Garner C.I. every Wednesday for approximately five hours. Nurse Carlone contacted Nurse Messenger and informed her of Mr. McKinnon's request. (Carlone Aff., paras. 4-5; Messenger Aff., para. 8; O'Halloran Aff., para. 4).

20. Dr. O'Halloran is familiar with the care and treatment provided to Mr. McKinnon in that he would see Mr. McKinnon at the I.D. Clinics at Garner C.I. on the average of once every three months and sometimes more frequently than that. (O'Halloran's Aff., para. 6; Ex. A to O'Halloran Aff.). This interval is generally appropriate and adequate for the purpose of monitoring and treating an HIV patient whose condition is stable. When he was at Garner C.I., Mr. McKinnon's HIV condition was relatively stable. (O'Halloran Aff., para. 7; Blanchette Aff., para. 8).

21. When Dr. O'Halloran would see Mr. McKinnon in the I.D. Clinic, it was to assess and treat his HIV-related condition. He would order tests to monitor the progress of the disease and would order treatments that were deemed appropriate based on the outcome of tests, the patient's subjective complaints and his physical assessment of the patient. (O'Halloran Aff., para. 7).

22. In the interval between their regularly scheduled appointments at the I.D. Clinic, the day-to-day medical needs of infectious disease patients can typically be addressed by the regular nursing and physician staff at the correctional facility. This is the protocol at every

correctional facility in the state. (O'Halloran Aff., para. 8; Messenger Aff., para. 11; Blanchette Aff., para. 9).

23. In the event that an inmate asks to be seen in the I.D. Clinic prior to his next scheduled appointment, any such request must be triaged by the HIV contact nurse. This is necessary because the I.D. Clinics are usually booked to capacity with regularly scheduled appointments and the day-to-day medical needs of an inmate can usually be adequately addressed by the facility medical staff. It is the responsibility of the HIV contact nurse to determine whether an inmate should be seen in the I.D. Clinic on an emergency basis. (O'Halloran Aff., para. 10; Blanchette Aff., para. 11; Messenger Aff., para. 11).

24. The protocol for scheduling appointments with the I.D. Clinic and the need to cooperate with facility medical staff in the interim between appointments with the I.D. Specialist was explained to Mr. McKinnon on many occasions by Dr. O'Halloran, Nurse Messenger and other medical staff. Notwithstanding these attempts to reason with Mr. McKinnon, he was often belligerent and hostile and refused to comply with the procedures that all other inmates were required to follow. (O'Halloran Aff., para. 11; Messenger Aff., para. 14).

25. Mr. McKinnon had been seen by Dr. O'Halloran in the I.D. Clinic on November 20, 2002. At that time, Dr. O'Halloran had ordered that some blood work be done in two months and that Mr. McKinnon be scheduled for another appointment at the I.D. Clinic following completion of the blood work. (Messenger Aff., para. 9; O'Halloran Aff., para. 12; Ex. C to Messenger Aff. and Ex. A to O'Halloran Aff.).

26. When Nurse Carlone informed Nurse Messenger on December 18, 2002, that Mr. McKinnon wanted to see the I.D. Specialist, Nurse Messenger asked her to meet with

Mr. McKinnon to determine why he wanted an emergency appointment with Dr. O'Halloran. (Messenger Aff., para. 12; Carlone Aff., para. 6).

27. Nurse Carlone took Mr. McKinnon into a room and spoke with him privately as to why he wanted to see Dr. O'Halloran before his next regularly scheduled appointment. Mr. McKinnon refused to discuss the reason why he wanted to see Dr. O'Halloran. Nurse Carlone tried to explain to Mr. McKinnon the procedure for scheduling I.D. Clinic appointments to no avail. During this meeting, Mr. McKinnon did not mention any particular medical problem or medical issue. Nurse Carlone contacted Nurse Messenger and informed her of Mr. McKinnon's refusal to discuss his reasons for wanting to see Dr. O'Halloran. (Carlone Aff., paras. 7-11; Ex. A to Carlone Aff.; Messenger Aff., para. 13).

28. After reporting the results of her conversation with Mr. McKinnon to Nurse Messenger on December 18, 2002, Nurse Carlone had no further contact with Mr. McKinnon or Nurse Messenger concerning his request to see Dr. O'Halloran. (Carlone Aff., para. 13).

29. With Mr. McKinnon refusing to disclose any reason for wanting to see Dr. O'Halloran and there being no observable evidence supporting such a request, his refusal to cooperate was documented and his request was denied. (Messenger Aff., para. 15; Ex. D. to Messenger Aff.).

30. In the opinion of Dr. O'Halloran and Dr. Blanchette, it was not only appropriate for Nurse Messenger to have tried to ascertain why Mr. McKinnon was requesting an emergency referral to the I.D. Clinic, it was part of her job responsibility to do so. Since the request had been made to Nurse Carlone, it was appropriate for Nurse Messenger to have asked Nurse Carlone to inquire as to the reason for his request. There being no apparent reason for the

request and given Mr. McKinnon's refusal to discuss any medical issues with Nurse Carlone, his request was appropriately denied. (O'Halloran Aff., para. 12; Blanchette Aff., para. 11).

31. As Dr. O'Halloran was leaving the I.D. Clinic at Garner C.I. on January 8, 2003, he was asked if he would see Mr. McKinnon because Mr. McKinnon was causing a good deal of stress among the nursing staff due to his continuing refusal to discuss his medical issues with anyone other than Dr. O'Halloran. Dr. O'Halloran agreed to see him. Mr. McKinnon's main concern at that time had to do with his request for a bar of Basis soap which is somewhat less harsh than regular soap. He also asked Dr. O'Halloran to look at his toenails as he was being treated for a fungus condition. Finally, he asked if Dr. O'Halloran would move up the liver function studies which he had earlier ordered to be done around the end of January, 2003. (O'Halloran Aff., para. 13; Messenger Aff., para. 16; Ex. C to Messenger Aff. and Ex. A to O'Halloran Aff.).

32. Mr. McKinnon's questions regarding the soap and the toenails could easily have been addressed by the Garner medical staff and clearly did not require an emergency appointment with the I.D. Clinic. (O'Halloran Aff., para. 13; Messenger Aff., para. 16; Blanchette Aff., para. 11).

33. Mr. McKinnon had been given a bar of Basis soap in November, 2002 because he had complained of dry skin and Dr. O'Halloran ordered another bar of Basis soap on January 8, 2003. Mr. McKinnon's toenails were looking better at the time of the visit on January 8, 2003 so Dr. O'Halloran continued the anti-fungal medication that Mr. McKinnon had been taking. Although there was no apparent reason for having the liver function tests done sooner than originally planned, Dr. O'Halloran nevertheless entered an order that the LFT tests be moved up. The tests were done on January 14, 2003 and the liver function studies reflected as "AST" and

"ALT" on the lab report were within normal limits. (O'Halloran Aff., para. 13; Exs. B and C to O'Halloran Aff.).

34. Although Mr. McKinnon would complain from time to time of dry skin, this was not a serious medical issue. Dr. O'Halloran would order Vaseline and Basis soap for Mr. McKinnon in an effort to get him to refocus his attention on the more serious issues concerning his HIV disease and his need to take his medications which he would periodically refuse to take. There is no indication in the record that Mr. McKinnon asked to see the facility physician regarding any problems with soap or Vaseline during December, 2002. There is a chart entry for November 8, 2002 indicating that Mr. McKinnon was demanding a whole jar of Vaseline and eventually agreed to accept a smaller amount. A medication card for December, 2002, reflects that Mr. McKinnon refused a tube of Vaseline on December 10, 2002, and was given a small tube of Vaseline on December 19, 2002. When Dr. O'Halloran saw Mr. McKinnon on January 8, 2003, Mr. McKinnon did not indicate that Nurse Messenger had denied him any soap or Vaseline and no such denial is reflected in the record. Dr. O'Halloran did not note any medical problems on January 8, 2003 that could be attributed to the absence of Basis soap or Vaseline. Dr. O'Halloran continued the order for Basis soap and Vaseline at that time because Mr. McKinnon stated that his skin was dry. (O'Halloran Aff., para. 15; Exs. B, D and E to O'Halloran Aff.).

35. On May 29, 2002, Dr. O'Halloran entered an order for Tylenol to be given to Mr. McKinnon on an as needed (prn) basis for complaints of pain. This order was for a period of six months and expired on November 29, 2002. (Messenger Aff., paras. 17-18; O'Halloran Aff., para. 16; Ex. B to O'Halloran Aff. and Ex. E to Messenger Aff.).

36. Mr. McKinnon did not discuss with Ms. Messenger any desire for a renewal of the Tylenol. The chart entries for the period November 29, 2002 through January 22, 2003 do not reflect any discussions with any medical staff person relating to a request for renewal of the Tylenol. (Messenger Aff., para. 19; Ex. F to Messenger Aff.).

37. The order for Tylenol could have been renewed by the facility physician if Mr. McKinnon had asked to see the facility physician. Of course, Mr. McKinnon was refusing to discuss any medical issues with medical staff at that point. On January 6, 2003, the facility dentist ordered Motrin because Mr. McKinnon had reported a toothache. (Messenger Aff., para. 20; O'Halloran Aff., para. 16; Ex. G to Messenger Aff.).

38. When Mr. McKinnon was seen by Dr. O'Halloran on January 8, 2003, there was no mention of any headache and no request for a renewal of Tylenol. (Messenger Aff., para. 21; O'Halloran Aff., para. 16; Ex. C to Messenger Aff.; Ex. A to O'Halloran Aff.).

39. It was not until Mr. McKinnon's visit with Dr. O'Halloran on January 22, 2003, that he requested some Tylenol. At that time, Dr. O'Halloran entered another order for Tylenol for a period of three months. (Messenger Aff., para. 22; O'Halloran Aff., para. 16; Exs. G and H to Messenger Aff. and Exs. A and B to O'Halloran Aff.).

40. Mr. McKinnon did not discuss any issues regarding Tylenol, Basis soap or Vaseline with Nurse Messenger or Nurse Carlone. If he had, he could have been referred to the facility physician. (Messenger Aff., para. 23; Carlone Aff, para. 14).

41. There is no evidence that Mr. McKinnon was in any way discriminated against at Garner C.I. in terms of the level of medical care he received and/or his access to medical care. As an I.D. Specialist who is primarily engaged in private practice, Dr. O'Halloran states without hesitation that the level of medical care provided to Mr. McKinnon at Garner C.I. was

comparable to the level of care which private patients receive in the community.  In the opinion of Dr. O'Halloran and Dr. Blanchette, Mr. McKinnon received excellent care at Garner C.I. with lab reports for the period showing consistent improvement in his CD4 counts and PCR levels. His care was also in full compliance with the terms of the <u>Doe v. Meachum</u> consent decree. (O'Halloran Aff., para. 18; Blanchette Aff., para. 12; Messenger Aff., para. 27; Ex. G to O'Halloran Aff.).

42. Neither Linda Messenger nor Helen Dorsey have any involvement with inmate housing placement decisions, including Mr. McKinnon's placement in H Block, which are generally based on mental health and/or custody concerns.  (Carlone Aff., para. 16; Messenger Aff., para. 28; Dorsey Aff., para. 7).

43. Neither Linda Messenger nor Helen Dorsey are involved in drawing blood at Garner C.I. or have had any involvement in the drawing of Mr. McKinnon's blood for lab work. While Iris Carlone would occasionally draw blood, she does not recall ever drawing blood from Mr. McKinnon.  (Carlone Aff., para. 15; Messenger Aff., para. 24; Dorsey Aff., para. 7, Straiton Aff., para. 9).

44. To the best of the knowledge and belief of Nurse Messenger, Nurse Carlone and Ms. Dorsey, only one inmate at a time was allowed in the room when blood was drawn with other inmates waiting at the door.  They are not aware of any safety or confidentiality issues with respect to the drawing of blood at Garner C.I., nor has anyone previously brought any such concerns to their attention.  (Carlone Aff., para. 15; Messenger Aff., paras. 25-26; Dorsey Aff., para. 7).

45. Helen Dorsey was the Health Services Administrator at Garner C.I. during the period from 2001 through her retirement in May, 2003.  (Dorsey Aff., para. 1).

46.     As the Health Services Administrator, one of Ms. Dorsey's job responsibilities was to serve as the Level 2 reviewer of medical grievances that were filed at Garner C.I. (Dorsey Aff., para. 2).

47.     On January 13, 2003, Ms. Dorsey responded to one of Mr. McKinnon's grievances by pointing out to him that once his order for Tylenol had expired, he must formally request a renewal of the order from a nurse or a physician. Ms. Dorsey also noted that when Mr. McKinnon saw Dr. O'Halloran on January 8, 2003, his soap and Vaseline were reordered, however, he had not requested a renewal of Tylenol or reported any headaches. In preparing this response, Ms. Dorsey was simply repeating the procedures to follow in a seeking a new order for expired medications and pointing out information contained in his medical records. (Dorsey Aff., para. 5; grievances attached to the Complaint).

48.     On January 29, 2003, Ms. Dorsey responded to two of Mr. McKinnon's grievances by indicating that he had regularly scheduled I.D. Clinic appointments with the I.D. Specialist and that he would be seen by the Garner C.I. nursing staff and facility physician for day-to-day medical issues that may come up in between his appointments with the I.D. Specialist. In doing so, Ms. Dorsey was explaining to Mr. McKinnon the procedures that apply to all inmates in all correctional facilities who are seen in the various I.D. Clinics. (Dorsey Aff., para. 6; grievances attached to Complaint).

49.     Barbara N. Straiton has been employed as an L.P.N. at Garner C.I. since 1993. During the past five years, her job responsibilities have included drawing blood for tests that have been ordered by facility physicians. (Straiton Aff., paras. 1-2).

50. At Garner C.I., blood is typically drawn in a room in the medical unit. On occasion, Nurse Straiton will go to the housing units, including H Block, if escorts for the inmates are not available. (Straiton Aff., para. 3).

51. When blood is drawn in H Block, it is done in the unit multipurpose room. The procedure followed in H Block when drawing blood is the same procedure followed in the medical unit. (Straiton Aff., para. 4).

52. Inmates who come to have their blood drawn in H Block at Garner C.I. must wait outside the room. There is a correctional officer on duty at the door to insure that the inmates are orderly. The inmates are called into the room one at a time to have their blood drawn. The other inmates must wait at the door. There would be a serious safety issue if other inmates were allowed to be in the immediate area where several syringes are readily available. (Straiton Aff., para. 5).

53. When Nurse Straiton is finished drawing the blood of an inmate, she will turn over the blood work requisition form for that inmate and call in the next inmate. At no time are inmates allowed to look at the blood work requisition sheets relating to another inmate. This same procedure is followed regardless of whether the blood is being drawn in the medical unit or in the multipurpose room in H Block. (Straiton Aff., para. 6).

54. Nurse Straiton had drawn Mr. McKinnon's blood on occasion when he was incarcerated at Garner C.I. On one occasion when she was drawing blood in the multipurpose room of H Block, Mr. McKinnon came in and refused to have his blood drawn. This occurred on February 10, 2003. Nurse Straiton prepared a refusal form which Mr. McKinnon refused to sign. The procedures for drawing blood outlined above were followed in Mr. McKinnon's case

and he was not treated any differently than all of the other inmates having their blood drawn. (Straiton Aff., para. 7; Ex. A to Straiton Aff.).

55. Nurse Straiton is not aware of any complaints regarding confidentiality as it relates to the drawing of blood at Garner C.I. When Mr. McKinnon refused to have his blood drawn on February 10, 2003, Nurse Straiton does not recall him saying anything about confidentiality. (Straiton Aff., para. 8).

56. Joan Dobson, R.N., is the medical grievance coordinator at Garner C.I. As the medical grievance coordinator, it is her responsibility to keep on file copies of inmate medical grievances and responses thereto. (Dobson Aff., paras. 1-2).

57. Nurse Dobson conducted a search of the medical grievance records and files at Garner C.I. She did not locate any medical grievances filed by Mr. McKinnon relating to the drawing of blood in H Block. (Dobson Aff., para. 3).

58. The search conducted by Nurse Dobson also did not reveal any record of Mr. McKinnon ever having filed a medical grievance at Garner C.I. relating to any alleged violations of his rights under the Americans With Disabilities Act. (Dobson Aff., para. 4).

        DEFENDANTS
        Linda Messenger, et al.

        RICHARD BLUMENTHAL
        ATTORNEY GENERAL

BY:    /s/_____
       Richard T. Couture
       Assistant Attorney General
       110 Sherman Street
       Hartford, CT  06105
       Federal Bar #ct05480
       E-Mail:  richard.couture@po.state.ct.us
       Tel.: (860) 808-5450
       Fax: (860) 808-5591

## **CERTIFICATION**

I hereby certify that a copy of the foregoing Local Rule 56(a)1 Statement was sent by first class mail, postage prepaid, this 18th day of March, 2004, to:

James McKinnon, No. 100770
MacDougall-Walker Correctional Institution
1153 East Street South
Suffield, CT  06080

\_\_\_/s/_____
Richard T. Couture
Assistant Attorney General